**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN DOE, | No. 4:19-CV-01584 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| PENNSYLVANIA DEPARTMENT OF CORRECTIONS, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**AUGUST 9, 2022**

## I.     BACKGROUND

Plaintiff John Doe filed an eight-count complaint, alleging a hostile work environment, constructive discharge, failure to accommodate, and retaliation. This case is predicated on the Court's federal question jurisdiction, as Doe brings claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794. Defendants include the Pennsylvania Department of Corrections, Superintendent Thomas McGinley, Deputy Superintendent Edward Baumbach, Major Victor Mirarchi, Sergeant Leonard, Lieutenant Peters, Sergeant Batiuk, Lieutenant Procopio, and James Roe.

Instead of moving to dismiss, Defendants answered Doe's Complaint. And after discovery closed, Defendants moved for summary judgment in their favor.

This motion for summary judgment is now ripe for disposition.  For the reasons below, it is granted in part and denied in part.

## II.   STANDARD OF REVIEW

The Court begins its analysis of Defendants' motion for summary judgment with the standard of review.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[1] The Supreme Court of the United States has advised that Federal Rule of Civil Procedure 56 "should be interpreted in a way that allows it to accomplish this purpose."[2]  Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3]

Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[4]  A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[5]   And a plaintiff must "point to

---

[1]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[2]   *Id.* at 324.

[3]   Fed. R. Civ. P. 56(a).

[4]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[5]   *Clark*, 9 F.3d at 326.

admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[6]

A judge's task when "ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[7] Thus, if "the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[8]

"The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]."[9] Part of the judge's role at this stage is to ask "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."[10] In answering that question, the Court "must view the facts and evidence presented on the motion

---

[6]  *Id.*
[7]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).
[8]  *Id.*
[9]  *Daniels v. School Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252 (alterations in original)).
[10] *Liberty Lobby*, 477 U.S. at 252 *(*quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871) (alteration and emphasis in original)).

in the light most favorable to the nonmoving party."[11]  The evidentiary record at trial

will typically never surpass what was compiled during discovery.

The party requesting summary judgment bears the initial burden of supporting

its motion with evidence from the record.[12]  For example, while "at the motion-to-

dismiss stage of proceedings a district court is obligated to accept the allegations in

a plaintiff's complaint as true, it does not accept mere allegations as true at the

summary judgment stage."[13]  The moving party must identify those portions of the

"pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, which it believes demonstrate the absence of a genuine

issue of material fact."[14]  "Regardless of whether the moving party accompanies its

summary judgment motion with affidavits, the motion may, and should, be granted

so long as whatever is before the district court demonstrates that the standard for the

entry of summary judgment, as set forth in Rule 56(c), is satisfied."[15]

For movants and nonmovants alike, the assertion "that a fact cannot be or is

genuinely disputed" must be supported by: (1) citations to particular parts of

materials in the record that go beyond mere allegations; (2) a showing that the

materials cited do not establish the absence or presence of a genuine dispute; or (3)

---

[11]  *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).
[12]  *Celotex*, 477 U.S. at 323.
[13]  *Wiest v. Tyco Electronics Corp.*, 812 F.3d 319, 330 (3d Cir. 2016).
[14]  *Id.* (internal quotations omitted).
[15]  *Id.*

a display that an adverse party cannot produce admissible evidence to support the fact.[16]

Summary judgment is effectively "put up or shut up time" for the nonmoving party.[17] When the movant properly supports his motion, the nonmoving party must show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[18] The nonmoving party will not withstand summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[19] Instead, it must "identify those facts of record which would contradict the facts identified by the movant.'"[20] Moreover, "if a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)" the Court may "consider the fact undisputed for purposes of the motion."[21] On a motion for summary judgment, "the court need consider only the cited materials, but it may consider other materials in the record."[22]

Finally, "at the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether

---

[16]  Fed. R. Civ. P. 56(c)(1).

[17]  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (Fisher, J.).

[18]  *Liberty Lobby*, 477 U.S. at 250.

[19]  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

[20]  *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003).

[21]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613–14 (3d Cir. 2018).

[22]  Fed. R. Civ. P. 56(c)(3).

there is a genuine issue for trial."[23]   "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."[24]

## III.   UNDISPUTED FACTS

With that standard outlining the framework for review, the Court now turns

to the undisputed facts.

In October 2013, Doe began working at The State Correctional Institution at

Coal Township ("SCI-Coal Township").[25]   After completing his training, Doe

became a Corrections Officer I, which included assignments as a utility officer and

block officer.[26]  Doe described his job duties as follows:

> I mean, there were multiple positions, multiple positions.  Being
> a utility officer, just maintaining care, custody and control of those that
> I would be overseeing, whether it be in their rec yard or on a unit as a
> relief of another officer.  Just following whatever duties were assigned
> to me that day.
> Being a block officer would be the same thing, maintaining care,
> custody and control, making sure that I'm completing my counts, my
> rounds, accountability for the inmates on the housing unit that I was on
> for that day, reporting to my immediate supervisor.[27]

Doe alleged that on December 8, 2016, "Sergeant Batiuk began accusatively

inquiring in an unprofessional and very rude tone about why specific inmates were

---

[23]   *Liberty Lobby*, 477 U.S. at 249.

[24]   *Id*. at 249–50 (internal citations omitted).

[25]   Doc. 47 at ¶ 1.

[26]   *Id.* at ¶ 3.

[27]   Doc. 47-2 at 7.

out of their cells."[28]  Doe told Batiuk to stop harassing him.[29]  But Batiuk "snapped back that it [wasn't] called harassment."[30]

Doe further alleged that on "that specific day, there was a female utility officer that received the complete opposite treatment that [he] received."[31]  This led Doe "to feel as though [Batiuk was] discriminating against [him] for [his] gender identity, orientation and/or race."[32]  When Doe complained, Lieutenant Peters stated that Doe was making "some very serious allegations" and "[t]hat [Peters] would take care of it."[33]

That month, Doe spoke to Superintendent Thomas McGinley about transitioning to the male gender.[34]  Doe asked McGinley about policies for transgender employees.[35]  Doe also informed McGinley that he had begun hormonal treatments and was anticipating making some changes in his life.[36]

In response, McGinley patted Doe on the back and said that he would get back to him.[37]  Then McGinley contacted Kristine Holt, a Field Human Resources Officer at SCI–Coal Township, for guidance on how to appropriately handle Doe's

---

[28]  *Id.* at 8.
[29]  *Id.*
[30]  *Id.*
[31]  *Id.* at 9.
[32]  *Id.* at 8.
[33]  *Id.* at 12.
[34]  *Id.* at 9.
[35]  *Id.* at 10.
[36]  *Id.*
[37]  *Id.*

transition.[38]  McGinley asked Holt if the DOC had "any policies in place regarding how to address transgender employees and how they affect gender based posts."[39]

In January 2017, Doe agreed to discuss his transition with Deputy Superintendent Edward Baumbach in a separate conference room.[40]  When Doe arrived, Baumbach, Holt, and Major Victor Mirarchi were present.[41]  Then Doe received the DOC's Gender Transition Guidelines.[42]

During this meeting, Doe announced that he was getting his first hormone injections in March 2017, the effects of which would become noticeable about sixty days later.[43]  Doe allowed the attendees to inform commissioned staff of his transition.[44]  Doe further indicated that he wanted others to refer to him by a male name going forward.[45]

After the January 2017 meeting, other meetings proceeded.[46]  During these later meetings, attendees instructed Doe to voice any complaints regarding his transition.[47]  Attendees also asked Doe if they could do anything to help him.[48]

---

[38]  Doc. 47 at ¶ 9.
[39]  *Id.* at ¶ 10.
[40]  *Id.* at ¶¶ 14–15.
[41]  *Id.* at ¶ 16.
[42]  *Id.* at ¶ 17.
[43]  *Id.* at ¶ 18.
[44]  *Id.* at ¶ 19.
[45]  *Id.*
[46]  Doc. 47-2 at 16.
[47]  *Id.*
[48]  *Id.*

In February 2017, Doe reported to Baumbach that an inmate had overheard Peters, Lieutenant Rich, and Sergeant Green making derogatory comments about Doe.[49]  The inmate "said that one of them had made the comment that [Doe] need[ed] to stop making things about his gender identity; that [Doe] wasn't going to last long, and they[] [would] see to it."[50]  The inmate had also heard these corrections officers saying that Doe had to "pull up" his gender identity every time something did not go his way.[51]

Doe alleged mistreatment again in June 2017, submitting a written report to Baumbach.[52]  But this report did not specify who had mistreated Doe.[53]  So Baumbach was unable to investigate Doe's allegations.[54]

In July 2017, Doe contacted Tiffany Epoca, Director at the Office of Equal Employment Opportunity at the DOC, to make a complaint.[55]  Epoca told Doe that DOC policy required him to specify a date at which he would begin presenting in the male gender.[56]  Until then, Doe would have to "follow all the rules including and not limited to dress codes and post assignments of the female gender."[57]

---

[49]  *Id.* at 13.
[50]  *Id.*
[51]  *Id.*
[52]  Doc. 47 at ¶ 43.
[53]  *Id.* at ¶ 44.
[54]  *Id.* at ¶ 45.
[55]  *Id.* at ¶ 28.
[56]  *Id.* at ¶ 29.
[57]  Doc. 47-9 at 6.

Doe also asked to bring a prosthetic penis to work.[58]  Doe was "told that [he] would have to fill out a gate clearance, which [he] was fine with."[59]  But the prosthetic had a "hollowed-out component . . . that could potentially be used as smuggling device."[60]  Doe believed that this component would have subjected him to searches upon entering the prison facility, which he objected to.[61]  So Doe did not bring the prosthetic into the facility.[62]

On November 17, 2017, Doe submitted a letter announcing his "intent to resign from [his] current position as Correction Officer I at SCI Coal Township."[63]  On November 19, 2017, Doe submitted another letter specifying November 19 as his "last day of employment with SCI Coal Township" and stating that "situations and circumstances beyond [his] control . . lead [sic] to this decision."[64]  Doe signed both letters using his female name.[65]

---

[58]   Doc. 47 at ¶ 31.
[59]   *Id.* at ¶ 32.
[60]   *Id.* at ¶ 33.
[61]   *Id.* at ¶¶ 34–35.
[62]   *Id.* at ¶ 35.
[63]   *Id.* at ¶ 46.
[64]   *Id.* at ¶ 48.
[65]   *Id.* at ¶ 49.

## IV.   ANALYSIS

### A.   James Roe Defendant

In his Complaint, Doe sues an anonymous James Roe defendant.[66]   But discovery has closed, and Doe has yet to identify this James Roe defendant.[67] Accordingly, James Roe is dismissed as a party.[68]

### B.   Counts I and II

#### 1.   Hostile Work Environment

First, Doe claims a hostile work environment based on sex/gender under the Equal Protection Clause.

> To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of respondeat superior liability.[69]

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.   These may include the frequency of the discriminatory conduct;   its severity;   whether it is physically threatening or

---

[66]   Doc. 1 at 1.

[67]   *See* Doc. 52-1.

[68]   *See Blakeslee v. Clinton County.*, 336 F. App'x 248, 250 (3d Cir. 2009) ("If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed."); *see also Graham-Smith v. City of Wilkes-Barre*, No. 3:17-CV-00239, 2020 WL 9607112, at *5 (M.D. Pa. Feb. 26, 2020) ("Thus, if a plaintiff fails to amend a complaint to identify unnamed John Doe defendants, a court may *sua sponte* dismiss those defendants prior to ruling on a summary judgment motion."), *report and recommendation adopted,* No. 3:17-CV-239, 2021 WL 2020591 (M.D. Pa. May 19, 2021).

[69]   *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[70]

Here, Doe testified that "[f]rom the moment that [he] had disclosed [his] intent to transition until the day that [he] had left," DOC staff and inmates "misgendered [him] with female pronouns on an almost daily basis."[71]   When Doe corrected a fellow officer's pronoun usage, the officer replied, "Well, you still have tits and a twat, right?"[72]  Another officer told Doe, "You minorities get what you deserve."[73]

When Doe reported harassment to his supervisors, "Baumbach . . . started yelling at [him]."[74]  And after Doe reported a particular officer's harassment, he "was met outside by not only [the officer] himself, but also his brother, who was also an officer, and a few other officers, outside, which made [Doe] feel very unsafe and uncomfortable by the show of force of kind of, like, them versus [Doe]."[75]  From this testimony about physical intimidation, discriminatory comments, and almost daily misgendering, a reasonable juror could find a hostile work environment.

Defendants counter that none of these incidents were severe enough to constitute a hostile work environment.   But the Third Circuit has "precluded an

---

[70]  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).
[71]  Doc. 47-2 at 40.
[72]  *Id.* at 30.
[73]  *Id.* at 33.
[74]  *Id.* at 16.
[75]  *Id.* at 17.

individualized, incident-by-incident approach."[76]   "Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, the focus is the work atmosphere as a whole."[77] Viewing the totality of the circumstances and Doe's work atmosphere as a whole, a reasonable juror could find a hostile work environment.

## 2.   Constructive Discharge

Next, Doe claims constructive discharge based on sex/gender under the Equal Protection Clause.  "A hostile-environment constructive discharge claim entails something more: working conditions so intolerable that a reasonable person would have felt compelled to resign."[78]  "In determining whether an employee was forced to resign, we consider a number of factors, including whether the employee was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations."[79]

Defendants argue that Doe's constructive discharge claim based on sex/gender under the Equal Protection Clause fails for the "same reasons" as his hostile work environment claim.[80]  But as the Court explained above, Doe has

---

[76]  *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 756 (3d Cir. 1995) (reversing judgment in defendant-employer's favor on hostile work environment claim).

[77]  *Id.*

[78]  *Pennsylvania State Police v. Suders*, 542 U.S. 129, 131 (2004).

[79]  *Mandel*, 706 F.3d at 169–70.

[80]  Doc. 48 at 31.

adequately shown a hostile work environment based on sex/gender under the Equal Protection Clause at this stage. So Doe's constructive discharge claim does not fail either.

Defendants counter that none of the six factors indicative of constructive discharge are present here. "However, it is important to note that we have never made the . . . factors an absolute requirement for recovery. . . . The absence of the factors . . . is not necessarily dispositive."[81] Accordingly, Doe's constructive discharge claim based on sex/gender under the Equal Protection Clause survives summary judgment.

### 3.   Personal Involvement

The Court "must next determine which individual Defendants were personally involved in creating the hostile work environment."[82] "Personal involvement exists where the defendant engaged in the purposeful discriminatory conduct himself or knowingly acquiesced to it."[83] The Court analyzes the individual defendants' involvement as follows.

---

[81] *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 168 (3d Cir. 2001).

[82] *McCowan v. City of Philadelphia*, No. CV 19-3326-KSM, 2022 WL 742687, at *31 (E.D. Pa. Mar. 10, 2022).

[83] *A. F. by & through Fultz v. Ambridge Area Sch. Dist.*, No. 2:21-CV-1051, 2021 WL 3855900, at *7 (W.D. Pa. Aug. 27, 2021).

### a.    McGinley, Leonard, Peters, and Procopio

In his brief opposing summary judgment, Doe never mentions Superintendent McGinley, Sergeant Leonard, Lieutenant Peters, or Lieutenant Procopio.[84]  Nor does Doe's brief explain these individual defendants' personal involvement.[85] Accordingly, Doe has not met his summary judgment burden to show these defendants' personal involvement.[86]  Defendants' motion for summary judgment is granted as to the claims against McGinley, Leonard, Peters, and Procopio in Counts I and II of Doe's Complaint.

### b.    Baumbach

In his deposition, Doe testified that Deputy Superintendent Edward Baumbach "got quite heated" and "started yelling at [him]" after he reported harassment.[87]  Such evidence "is sufficient to raise a genuine issue of material fact as to whether [Baumbach] was personally involved in violating [Doe's] right to equal protection."[88]  Accordingly, Defendants' motion for summary judgment is denied as to Doe's claims against Baumbach in Counts I and II of the Complaint.

---

[84]   Doc. 52-1.

[85]   *Id.*

[86]   *See Perkins v. City of Elizabeth*, 412 F. App'x 554, 555 (3d Cir. 2011) ("We emphasize, as did the District Court, that a court is not obliged to scour the record to find evidence that will support a party's claims. When parties fail to support their claims with adequate citations to the record, they risk having those claims rejected, as was rightly done here.") (citation omitted).

[87]   Doc. 47-2 at 16.

[88]   *Ivan v. Cnty. of Middlesex*, 595 F. Supp. 2d 425, 480 (D.N.J. 2009) (denying summary judgment because "Plaintiffs also produced evidence that after Jazikoff met with the County's personnel department to report the various incidents of sexual harassment, Undersheriff Falcone berated Jazikoff and was hostile toward her").

### c.   Batiuk

In his deposition, Doe testified that Sergeant Batiuk "would mimic [him]," and "cussed and swore at and to [him] aggressively in front of numerous inmates, belittling [his work."[89]   Doe also testified that Batiuk threw Doe's phone on the desk.[90]   Doe further testified that he had "never . . . seen or heard of Sergeant Batiuk mistreating anyone to this extent . . ."[91]   Viewing this testimony in the light most favorable to Doe, a reasonable juror could find that Batiuk was personally involved in a hostile work environment.[92]

Defendants counter that though Batiuk was unprofessional, Doe has not shown discriminatory intent.   But "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."[93]   So a "jury could determine that this hostile work environment stemmed from" Batiuk's "facially neutral mistreatment . . . ."[94]   Defendants' motion for summary judgment is denied as to Doe's claims against Batiuk in Counts I and II of the Complaint.

---

[89]   Doc. 47-2 at 8.

[90]   *Id.*

[91]   *Id.*

[92]   *Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 132–34 (3d Cir. 2011) (reversing summary judgment in defendant-employer's favor when plaintiff-employee's co-worker "would throw [plaintiff's] paperwork on the floor" and did not treat other co-workers "in a similarly rude, disrespectful, or hostile manner").

[93]   *Cardenas v. Massey*, 269 F.3d 251, 261–62 (3d Cir. 2001) (reversing summary judgment in defendant-employer's favor on hostile work environment claim).

[94]   *Id.* at 263.

### d.   Mirarchi

In  his deposition, Doe testified that his "allegations about Victor Mirarchi's conduct" involved "[j]ust the mis-enforcement of the gender confirmation."[95]  And in his brief opposing summary judgment, Doe claims that he "was provided the Confirmation of Gender Presentation Date Form by . . . Mr. Mirarchi . . . ."[96]  In other words, Doe claims that Mirarchi contributed to a hostile work environment by denying Doe's accommodation request to use male sanitary facilities until Doe provided a gender-presentation date.

But the United States District Court for the Western District of Pennsylvania has held that "the mere denial of a requested accommodation, with nothing more, will not rise to the level of a hostile work environment."[97]  And the United States District Court for the District of Delaware has held that "the unreasonableness of the accommodations . . . does not establish a hostile work environment."[98]  Following this persuasive authority, Mirarchi did not become personally involved in a hostile work environment just by denying Doe's accommodation request to use male sanitary facilities until Doe provided a gender-presentation date.

---

[95]   Doc. 47-2 at 41.
[96]   Doc. 52-1 at 13.
[97]   *Busch v. Oswayo Valley Sch. Dist.*, No. 1:15-CV-239, 2016 WL 5394085, at *9 (W.D. Pa. Sept. 27, 2016) (citation omitted).
[98]   *Lampkins v. Mitra QSR KNE, LLC*, 383 F. Supp. 3d 315, 329 (D. Del. 2019).

Besides the gender-presentation date, Doe's brief opposing summary judgment does not mention Mirarchi anywhere else.[99]   Accordingly, Doe has not met his summary-judgment burden to show Mirarchi's personal involvement in a hostile work environment or constructive discharge.   Defendants' motion for summary judgment is granted as to Doe's claims against Mirarchi in Counts I and II of his Complaint.

### C.    Counts III and IV

Doe also claims a hostile work environment and constructive discharge based on disability under the Equal Protection Clause.   Defendants argue that these claims are not cognizable because "disabled individuals" are not "protected classes of individuals" under the Equal Protection Clause.[100]   Indeed, various federal courts have held that Equal Protection claims for hostile work environment and constructive discharge based on disability are "not actionable under § 1983."[101]

Regardless, Doe does not respond to Defendants' argument about these claims' viability.[102]   Nor does Doe address whether the Equal Protection Clause

---

[99]   Doc. 52-1.

[100]   *Douglas v. Kustenbauder*, No. 1:18-CV-00252, 2021 WL 1087666, at *6 (M.D. Pa. Mar. 22, 2021).

[101]   *Fierro v. New York City Dep't of Educ.*, 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014); *see also Principe v. Vill. of Melrose Park*, No. 20 CV 1545, 2022 WL 488937, at *11 n.27 (N.D. Ill. Feb. 17, 2022) ("While the ADA prohibits employers from harassing employees on the basis of disability, plaintiff hasn't shown that the right to be free from such harassment is also protected by the Fourteenth Amendment.") (internal citation omitted); *Weinstein v. New York City Dep't of Educ.*, No. 16CV3118ILGRER, 2017 WL 2345640, at *4 (E.D.N.Y. May 30, 2017) ("Plaintiff's claims of disability discrimination, including hostile work environment, are not actionable under § 1983. Defendants' motion to dismiss those claims is GRANTED.").

[102]   Doc. 52-1.

permits hostile work environment and constructive discharge claims based on disability.[103]    Accordingly, Doe has waived or abandoned his Equal Protection claims for hostile work environment and constructive discharge based on disability.[104]    Defendants' motion for summary judgment is granted as to these claims.

### D.    Counts V and VI

Next, Doe claims a hostile work environment and constructive discharge based on disability under the RA.  Defendants argue that these claims fail for the "same reasons" Doe's Equal Protection claims for a hostile work environment and constructive discharge fail.[105]    But as the Court explained above, Doe's Equal Protection claims for a hostile work environment and constructive discharge based on sex/gender survive against several defendants.    So Defendants' motion for summary judgment is denied as to Doe's hostile work environment and constructive discharge claims under the RA.

---

[103] *Id.*

[104] *See Nissan World, LLC v. Mkt. Scan Info. Sys., Inc.*, No. CIV. 05-2839 MAH, 2014 WL 1716451, at *10 (D.N.J. Apr. 30, 2014) ("Failing to raise an argument in opposition to a motion for summary judgment constitutes a waiver of that argument."); *Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 558 (M.D. Pa. 2008), *aff'd*, 350 F. App'x 770 (3d Cir. 2009) ("Mills's counsel has failed to respond to arguments that defendants raised against these claims. As such, Mills has abandoned them, and summary judgment will be granted in defendants' favor."); *Smith v. Lucas*, No. CIV. 4:05-CV-1747, 2007 WL 1575231, at *10 (M.D. Pa. May 31, 2007) ("Moreover, based on Plaintiff's failure to even mention this claim in his opposing brief, it appears that he has abandoned the pursuit of said allegations. Thus, Defendants' unopposed argument requesting entry of summary judgment with respect to Plaintiff's conditions of confinement claims will be granted.").

[105] Doc. 48 at 33–34.

### E.     Count VII

Doe also claims that the DOC violated the RA by failing to accommodate his gender dysphoria.  In his Complaint, Doe alleged that the DOC required him to list his prosthetic penis on a gate clearance form, prevented him from conducting pat searches on other officers, and prevented him from using a male locker room and bathrooms.[106]  Doe also alleged that SCI-Coal Township's staff and inmates misgendered him with female pronouns.[107]  But Doe's brief opposing summary judgment does not mention the prosthetic penis or pat searches.[108]  So Doe has narrowed his failure-to-accommodate claim to the sanitary facility and pronoun issues only.[109]  The Court addresses each issue in turn.

### 1.     Male Facilities

Doe claims that the DOC failed to accommodate his requests to use a male locker room and bathrooms.  "Whether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same."[110]  To demonstrate a failure to accommodate, Doe must demonstrate that 1) the DOC knew about his gender dysphoria, 2) Doe requested accommodations or assistance for his gender dysphoria, 3) the DOC did not make a good-faith effort to

---

[106] Doc. 1 at ¶ 70.

[107] *Id.*

[108] Doc. 52-1.

[109] *See Olivares v. United States*, 447 F. App'x 347, 350 (3d Cir. 2011) ("Through counsel, Olivares opposed summary judgment; however, he did so on narrower grounds than those advanced in his original complaint . . . .").

[110] *McDonald v. Com. of Pa., Dep't of Pub. Welfare, Polk Ctr.*, 62 F.3d 92, 95 (3d Cir. 1995).

assist Doe in seeking accommodations; and 4) Doe could have been reasonably accommodated but for the DOC's lack of good faith.[111]

"The interactive process does not dictate that any particular concession must be made by the employer . . . . All the interactive process requires is that employers make a good-faith effort to seek accommodations."[112]  "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome."[113]

Here, the DOC made a good-faith effort to assist Doe in seeking accommodations.   In January 2017, Deputy Superintendent Baumbach, Major Mirarchi, and Field Human Resources Officer Holt met with Doe to discuss his transition.[114]  They provided Doe with "some policies for transgender staff and . . . discussed what [Doe's] plan was, asked some questions."[115]  These policies covered "lavatory facilities" and included a "gender confirmation letter" requiring Doe to specify a presentation date.[116]  The meeting's participants clarified that "there would

---

[111] *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 320 (3d Cir. 1999).
[112] *Id.* at 317.
[113] *Id.*
[114] Doc. 47-2 at 11.
[115] *Id.*
[116] *Id.*

be an open line of communication between [them]" and that "there would be an actual presentation date . . . ."[117]  Doe felt that the meeting was "supportive" and that he "might have had some people on [his] side."[118]

After the January 2017 meeting, the DOC held monthly meetings with Doe.[119] During these later meetings, attendees instructed Doe to voice any complaints regarding his transition.[120]  Attendees also asked Doe if they could do anything to help him.[121]

At the March 2017 meeting, Doe asked to use a male locker room and bathroom.[122]  DOC officials responded that Doe "could use the male facilities if [he] signed the gender confirmation letter."[123]  Doe confirmed that he could "use the male facilities if [he] provided a gender confirmation date in writing."[124]

In a private meeting with Major Mirarchi, Doe again asked "if there was any progress on [his] being able to utilize the male facilities."[125]  Mirarchi responded that "we gotta get that gender confirmation letter, is what I'm being told."[126]  Tiffany

---

[117] *Id.* at 12.
[118] *Id.*
[119] *Id.* at 16, 19.
[120] *Id.* at 16.
[121] *Id.*
[122] *Id.* at 19.
[123] *Id.* at 20.
[124] *Id.* at 24.
[125] *Id.* at 27.
[126] *Id.*

Epoca, Director at the DOC's Office of Equal Employment Opportunity, also counseled Doe about the "written presentation date."[127]

Until Doe provided a gender-presentation date, the DOC offered Doe the alternative of using a unisex visitors' bathroom.[128]   And Doe accepted that alternative "[f]or a period of time . . . ."[129]   But Doe chose "not to provide a date of confirmation until [he had] reached a greater level of masculinity."[130]

Such evidence demonstrates the DOC's good faith.   By repeatedly meeting with Doe about his transition and requests to use male facilities, allowing Doe to use male facilities if he provided a gender-presentation date, counseling Doe about the gender-presentation date, and offering the unisex bathroom as an alternative until Doe provided a gender-presentation date, the DOC made a good-faith effort to accommodate Doe.[131]

---

[127] Doc. 47-9 at 6.

[128] Doc. 47-2 at 24.

[129] *Id.*

[130] *Id.* at 20.

[131] *See Soutner v. Penn State Health*, 841 F. App'x 409, 415 (3d Cir. 2021) ("Soutner has failed to show that the Hospital did not make a good-faith effort to accommodate her. Cutman consistently met with Soutner about her absences, explained to her the Hospital's call-off procedures, and encouraged Soutner to apply for FMLA leave and report the absences as FMLA. Soutner also spoke with FMLASource representatives who counseled her on the policies and how to report her absences as FMLA."); *Petti v. Ocean Cnty. Bd. of Health*, 831 F. App'x 59, 63 (3d Cir. 2020) ("In this case, assuming without deciding that Petti can make out the first two elements of a prima facie case, the record reflects OCHD's consistent good faith efforts to respond to Petti's requests regarding the safety of her workplace, given the medical conditions she represented she had."); *Sessoms v. Trustees of Univ. of Pennsylvania*, 739 F. App'x 84, 88 (3d Cir. 2018) ("Penn demonstrated good faith in its negotiations with Sessoms. It is undisputed that her supervisors met with her, considered her requests, and offered several accommodations, including a part-time work schedule."); *Stadtmiller v. UPMC Health Plan, Inc.*, 491 F. App'x 334, 337 (3d Cir. 2012) ("In particular, upon learning of Stadtmiller's disabilities, UPMC met with him to discuss what accommodations he might need,

Doe counters that requiring a gender-presentation date was unreasonable and unduly burdensome. "The Court disagrees. The request for information itself was part of the interactive process."[132] "After receiving a request for an accommodation, an employer has the right and obligation to request additional information the employer believes it needs."[133] Indeed, "[j]udgment as a matter of law in favor of the employer has been granted in numerous decisions in which the employee failed to respond to the employer's requests for information."[134]

The DOC believed it needed a gender-presentation date to comply with regulations about cross-gender viewing and searches.[135] It "cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fail[ed] to supply" a gender-presentation date.[136] Accordingly, the gender-

---

quickly responded to his requests, ensured that his requests had been fulfilled, and detailed what he needed to do to improve his performance to meet the standard of his department. Therefore, we agree that Stadtmiller failed to raise a material question of fact regarding UPMC's good faith participation in the accommodation process and that it is entitled to judgment as a matter of law.").

[132] *Hemby-Grubb v. Indiana Univ. of Pennsylvania*, No. 2:06CV1307, 2008 WL 4372937, at *12 (W.D. Pa. Sept. 22, 2008) (granting summary judgment in defendant-employer's favor).

[133] *Tatum v. Hosp. of Univ. of Pennsylvania*, 57 F. Supp. 2d 145, 149 (E.D. Pa. 1999) (granting summary judgment in defendant-employer's favor), *aff'd*, 216 F.3d 1077 (3d Cir. 2000); *see also Taylor*, 184 F.3d at 315 ("Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs.").

[134] *Doyle v. Senneca Holdings, Inc.*, No. CV 20-1293, 2022 WL 1239501, at *5 (W.D. Pa. Apr. 27, 2022) (granting summary judgment in defendant-employer's favor).

[135] Docs. 47-7 at 7, 47-8 at 5, 47-9 at 7.

[136] *Taylor*, 184 F.3d at 317.

presentation date does not create a genuine dispute of material fact about the DOC's good-faith efforts.[137]

## 2.    Male Pronouns

Doe also claims that the DOC did not accommodate his requests to use male pronouns.[138]  But Doe does not adduce evidence that the DOC denied his requests to use male pronouns.[139]  Instead, Doe asserts that staff and inmates misgendered him with female pronouns.[140]

The Third Circuit addressed accommodation requests involving fellow employees' conduct in *Tourtellotte v. Eli Lilly & Company*.[141]  There, plaintiff Tourtellotte "request[ed] to not come in contact with" a supervisor whose inappropriate comments had caused her "extreme stress and anxiety."[142]  "Lilly did not ignore Tourtellotte's request and did not effectively force her to return to work

---

[137] *See Doyle*, 2022 WL 1239501, at *8 ("Under these circumstances, no reasonable jury could find that Senneca was responsible for the breakdown of the interactive process or that Senneca acted in bad faith. Senneca engaged in the good faith steps identified in *Taylor*. Doyle's failure to provide the requested medical information about his condition and his subsequent silence caused the breakdown in the interactive process.") (internal citation omitted); *Hamza v. United Cont'l Holdings, LLC*, No. CV 19-8971 (FLW), 2021 WL 3206814, at *15 (D.N.J. July 29, 2021) ("The facts alleged in the SAC demonstrate that Defendant engaged in an interactive process with Plaintiff and requested information it needed to process his request for disability leave, and that Plaintiff failed to comply with those requests. Accordingly, Plaintiff has failed to state a claim for failure to accommodate under the ADA.").

[138] *See* Doc. 52-1 at 13 ("According to Defendants' own policies, no documentation is necessary for Plaintiff's requests for gender-appropriate name and pronoun usage to be honored. <u>See</u> DOE v. PA DOC – P000025. Defendants did not accommodate Plaintiff in this respect.").

[139] *See* Docs. 47-2, 52-1, 52-2, 52-3, 52-4.

[140] Doc. 47-2 at 30, 40.

[141] 636 F. App'x 831 (3d Cir. 2016).

[142] *Id.* at 849.

without any accommodation."[143]  "Lilly told Tourtellotte that it could not guarantee that she would never come in contact with Rowland, and Tourtellotte has not presented any evidence indicating that this response to Tourtellotte's request was not made in good faith."[144]  So the Third Circuit affirmed "the finding of the District Court granting summary judgment against Tourtellotte on this claim."[145]

Here, Tiffany Epoca, Director at the Office of Equal Employment Opportunity at the DOC, told Doe that "if the conversations elevate to the use of derogatory terms or speech, please report this to Ms. Holt or myself."[146]  And when Doe reported that a fellow corrections officer had misgendered him, Doe's superiors stated that "it was [his] responsibility to redirect the officers at a minimum of twice; and had there been a third occurrence, that [he] was to share it with Baumbach, Mirarchi, or whomever [his] supervisor was for that day if they weren't present, and that they would handle the situation accordingly."[147]  Doe's superiors also assured him that "upon the third time, it would then be taken of by – through corrective action, if need be."[148]

Such responses demonstrate that the DOC "did not ignore [Doe's] request[s]" to use male pronouns.[149]  And Doe "has not presented any evidence indicating that

---

[143]  *Id.* at 850.
[144]  *Id.*
[145]  *Id.*
[146]  Doc. 47-2 at 30.
[147]  *Id.*
[148]  *Id.*
[149]  *Tourtellotte*, 636 F. App'x at 850.

this response to [his] request[s] was not made in good faith."[150]  In the absence of evidence to the contrary, there is no genuine dispute of material fact that the DOC made a good-faith effort to accommodate Doe's requests to use male pronouns. Accordingly, Defendants' motion for summary judgment is granted as to Doe's failure-to-accommodate claim.

### F.    Count VIII

Finally, Doe claims retaliation under the Rehabilitation Act.  In RA retaliation claims, "plaintiffs must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."[151]

Here, Doe does not brief the retaliation issue or respond to Defendants' arguments against his retaliation claim.[152]  In the absence of evidence or arguments to the contrary, Doe has not shown a genuine dispute of material fact regarding retaliation.[153]  Accordingly, Defendants' motion for summary judgment is granted as to Doe's retaliation claim.

---

[150]  *Id.*

[151]  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

[152]  Docs. 52-1, 52-2.

[153]  *See Perkins*, 412 F. App'x at 555 ("We emphasize, as did the District Court, that a court is not obliged to scour the record to find evidence that will support a party's claims. When parties fail to support their claims with adequate citations to the record, they risk having those claims rejected, as was rightly done here.") (citation omitted); *see also Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 556 (M.D. Pa. 2014) ("Courts within the Third Circuit have routinely held that a non-movant's failure to offer any response to an opposing party's summary judgment arguments constitutes an abandonment of claims left undefended. . . . Thus,

## V.     CONCLUSION

James Roe is dismissed as a party.   Defendants' motion for summary judgment is granted in part and denied in part.   An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

Diodato's breach of contract claim, as articulated in his complaint, fails to survive summary judgment.").